HEINZLE, by Next Friend, v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

**Division Two, June 14, 1904.**

1. **EXPERT WITNESSES: Qualification: Motorman.** A witness, who had been in the service of the defendant railway as a motorman for fifteen months, was familiar with the street crossing where the accident occurred, and had gone over that crossing twenty times a day during that time, is competent to testify as an expert as to what distance a car could be stopped at that crossing.

2. ———: **Proper Predicate.** A proper predicate for a question as to the time in which a street car could have been stopped after the discovery of a child on or approaching the track is not laid, if it does not include a car like the one which injured the child, with a reasonably skillful motorman in charge, and the use of reasonable diligence on his part, with due regard to the safety of the passengers.

3. **NEGLIGENCE: Rate of Speed.** Whether the rate of speed at which a street car is run constitutes negligence, depends upon the character of the train, place of the accident, and the peculiar surroundings of the tracks, and other circumstances.

4. ———: **Child Crossing Track: Caution.** Instructions which require the same degree of caution and prudence of a child five years old about to cross a street railway as is required of a person of any age of ordinary judgment and discretion, should not be given. Such child is required to exercise the care and prudence equal to her capacity.

5. **NEXT FRIEND: Appointment.** The question of whether a certain person has been duly appointed next friend for plaintiff, should not be submitted to the jury, but is a matter for the determination of the court.

6. **AVERMENTS: Enlargement by Instructions.** The instructions should not enlarge upon the averments in the petition. They should not submit an issue not made in the averments.

7. **EVIDENCE: Enlargement by Instructions.** Instructions should
not submit an issue when there is no evidence to warrant it.

8. ————: **Negligence: Connection With Accident: Ringing Bell.**
Where the evidence does not show or tend to show that de-
fendant's failure to ring the bell of the street car had any con-
nection with the injury to plaintiff, no instruction holding de-
fendant liable for that failure should be given.

Appeal from Jackson Circuit Court.—*Hon. Wm. B.
Teasdale,* Judge.

REVERSED AND REMANDED.

*John H. Lucas* for appellant.

(1)   The court erred in admitting incompetent evi-
dence offered by the plaintiff, over the objections of
the defendant, and in refusing to admit competent evi-
dence offered by defendant.   (a)   The court erred in
admitting incompetent evidence, namely:   That of an
alleged expert, as to distance in which the train could be
stopped.   Maher v. Railroad, 64 Mo. 276; Mammerberg
v. Railroad, 62 Mo. App. 567; Senn v. Railroad, 108 Mo.
150; Turner v. Hoar, 114 Mo. 335; Benjamin v. Rail-
road, 50 Mo. App. 602; Culbertson v. Railroad, 140
Mo. 59; Ruschenberg v. Railroad, 161 Mo. 81.   (b)
In the matter of the speed of the cars, witnesses
were not sworn to have any knowledge on the subject,
and yet were permitted to give an opinion.   Muth v.
Railroad, 87 Mo. App. 422; Campbell v. Railroad, 75 S.
W. 91.   (2)   Refusing to sustain demurrer to evidence,
and to give peremptory instruction.   (a)   Failure to
ring bell, and speed of car.   Kelley v. Railroad, 75 Mo.
108; Holman v. Railroad, 62 Mo. 562; Molyneux v.
Railroad, 81 Mo. App. 28; Thompson v. Railroad, 140
Mo. 125; Payne v. Railroad, 136 Mo. 562; Culbertson v.
Railroad, 140 Mo. 35; Hanlon v. Railroad, 104 Mo. 381;
Tanner v. Railroad, 161 Mo. 497; Vogg v. Railroad, 138
Mo. 172; Murray v. Railroad, 75 S. W. 611; Moore v.

Railroad, 75 S. W. 672; Zumault v. Railroad, 74 S. W. 1015; Holwerson v. Railroad, 157 Mo. 245. (b) The evidence demonstrated the fact that the accident was unavoidable. Nellis, Street Railroads, pp. 273, 374; Kennedy v. Railroad, 43 Mo. App. 3; Boland v. Railroad, 36 Mo. 484; Mashek v. Railroad, 71 Mo. 276; Chilton v. Railroad, 152 Pa. St. 425; Fenton v. Railroad, 126 N. Y. 625; Flanagan v. Railroad, 163 Pa. St. 102; Tishacek v. Railroad, 110 Wis. 417; Campbell v. Railroad, 104 La. 183; Sherman v. Railroad, 72 Mo. 62; Culbertson v. Railroad, 140 Mo. 35; Hays v. Railroad, 51 Mo. App. 438; Moore v. Railroad, 75 S. W. 672; Payne v. Railroad, 136 Mo. 593; Murray v. Railroad, 75 S. W. 611; Zumault v. Railroad, 74 S. W. 1015. (3) The court erred in giving instructions asked by the plaintiff, and in giving instructions of its own motion, and in refusing instructions asked by defendant. (a) Unsupported by evidence. (b) Submit legal questions to jury. Carroll v. Campbell, 110 Mo. 557; Woods v. Campbell, 110 Mo. 572; Jordan v. Hannibal, 87 Mo. 673; Albert v. Beesel, 88 Mo. 150. (c) Misleading and enlarges issues. Bank v. Murdock, 62 Mo. 70; Wilmot v. Corrigan, 106 Mo. 548; George v. Railroad, 40 Mo. App. 433; Livingston v. Railroad, 170 Mo. 472; Donohoe v. Railroad, 83 Mo. 560; Chitty v. Railroad, 148 Mo. 73; Waddingham v. Hulett, 92 Mo. 528; Wolfe v. Supreme Lodge, 160 Mo. 686. (4) Because the court erred in overruling the motion of the defendant for a new trial. The verdict is against the law as declared by the court, against the evidence and is excessive and the result of passion and prejudice. (a) Cohn v. Kansas City, 108 Mo. 387; Powell v. Railroad, 76 Mo. 80; Lenix v. Railroad, 76 Mo. 86; Payne v. Railroad, 136 Mo. 562; Hunt v. Railroad, 89 Mo. 607. (b) Spohn v. Railroad, 87 Mo. 84; Baker v. Stonebreaker, 36 Mo. 338; Cook v. Railroad, 94 Mo. App. 420. (5) The jury were guilty of misconduct, and the verdict was the

result of speculation and chance.   Lawyer v. Railroad, 37 Mo. 264.

*O. H. Dean, C. O. French* and *George W. Wright* for respondent.

(1)   Considering the physical facts and the surroundings which were well known to defendant's motorman, it became his duty to keep a vigilant lookout for children, to keep his car under control, to modify the speed, to sound an alarm, and, if necessary, to stop his car before striking the plaintiff. Thompson v. Railroad, 93 Mo. App. 548; Schmidt v. Railroad, 149 Mo. 288; Winters v. Railroad, 99 Mo. 509; Bunyan v. Railroad, 127 Mo. 18; Hanlon v. Railroad, 104 Mo. 389; Fielder v. Railroad, 107 Mo. 645; Hicks v. Railroad, 124 Mo. 115; Rosenkranz v. Railroad, 108 Mo. 14; Humbird v. Railroad, 110 Mo. 80.   (2) Defendant's motorman breached every duty mentioned in the preceding section, namely, he failed to keep a lookout; to keep his car under control; to check its speed; or to sound an alarm.   The ultimate fact of negligence was irresistible.   (a)   The motorman was looking north at a lady in the hotel.   (b) The car was running at a rapid and unusual rate of speed.   (c)   No effort was made to check the speed of the car until at the time of striking the child or afterwards.   (d)   The employees in charge of the car negligently failed to sound the gong or other warning signal, for which neglect of duty defendant became liable for all damages resulting therefrom.   Hook v. Railroad, 162 Mo. 569.   (3) The servants of defendant, in charge of the car, saw or could have seen the perilous situation of plaintiff in time to have checked the speed of said car or stopped it before inflicting the injuries proven.   (a)   The children started near the southeast corner and ran diagonally towards the northwest corner.   (b) The collision occurred between the rails of the north track in the middle of Fifth street, twenty-seven and one-half

feet from the last cross-walk. (c)  The child was found, after the accident, near the middle of the street.  (d) The colliding car was about the middle of the block between Fourth and Fifth streets when the children started in a northwesterly direction  towards the track.  (e) The car stopped with the rear platform upon, or five or six feet west, of the west cross-walk of Fifth street.  (f) In what distance could the car have been stopped?  (4) (a)  The question of the stoppage of the car applied only to the fourth and last alleged negligence.  The jury could properly find upon the three preceding acts of negligence, namely, failure to keep a vigilant watch, failure to run at the usual rate of speed and failure to sound an alarm.  In either event the question of ability to stop the car could have been wholly dispensed with. Defendant insists there was error in admitting the testimony of Stubbs, an expert motorman, because the hypothetical question does not contain many of the essential facts necessary to be shown before he could express himself as an expert.  Kaminski v. Tudor Iron Works, 167 Mo. 466; Brown v. Hufford, 69 Mo. 305; Benjamin v. Railroad, 50 Mo. App. 602; Rogers, Exp. Ev., 70-75; Lawson, Exp. Test., 275.  Under the evidence it was immaterial as to what distance this car could have been stopped, inasmuch as the motorman could have seen the child approaching, from the curve at Fourth street, a distance of 330 feet from the point of collision.  Schafstette v. Railroad, 175 Mo. 142.    (b)    The petition charges that the train ran at a rapid and unusual rate of speed, and failed to ring bell as a warning.  Covell v. Railroad, 82 Mo. App. 187; Haworth v. Railroad, 94 Mo. App. 224.  (5)  If the foregoing views be correct, or if upon the facts the judgment be for the right party, it is wholly useless to consider any of the alleged errors. Elbert v. Bank, 109 Mo. 445; Fitzgerald v. Barker, 96 Mo. 661; Kennedy v. Railroad, 36 Mo. 357; Doyle v. Railroad, 140 Mo. 1; Zellars v. Mo. Water Co., 92 Mo. App. 107.

BURGESS, J.—This is an action by plaintiff, a female between five and six years of age, for damages, caused by being run over by one of defendant's street cars in the city of Argentine, Kansas, on the 26th day of February, 1901.

The amount of damages sued for was twenty-five thousand dollars. The trial resulted in a verdict and judgment for plaintiff in the sum of nine thousand one hundred and sixty-six dollars and sixty-six cents.

Thereafter in due time defendant filed its motion for a new trial, which being overruled, it brings the case to this court by appeal for review.. The accident happened at the crossing of Fifth and Metropolitan avenue.

The negligence charged in the petition is that "defendant's servants and employees in charge of said car, negligently and wrongfully approached said crossing at a rapid and unusual rate of speed, and negligently failed to ring the bell or sound an alarm as a warning to plaintiff of its approach; that defendant's agents and servants and employees in charge of said car, negligently and wrongfully failed to keep a lookout ahead for pedestrians or other obstructions in or near defendant's tracks, at said street crossing, as required by law; and, further, that defendant's servants and employees in charge of said street car, saw the dangerous and perilous position of plaintiff on or near its said tracks in time to have checked or stopped said car before striking plaintiff, or by the exercise of ordinary care could have seen the perilous position in which plaintiff was situated in time to have done so."

The following state of facts is disclosed by the record: Fourth and Fifth streets run north and south. Fifth street lies west of Fourth. Metropolitan avenue runs east and west and crosses Fifth street where the accident occurred. The defendant company owns and operates two different tracks running parallel on Metropolitan avenue, cars moving west occupying the north

track, while cars moving east occupy the south track. A cross-walk spanned the avenue on the east side of Fifth street, from sidewalk to sidewalk, and another on the west side of Fifth street, which were 55 feet apart. The avenue is quite a steep down grade, from Fourth street to the cross-walk, on the east side of Fifth street, and from that point west for some distance it is practically level; the avenue otherwise was smooth and the view unobstructed.

At the southeast corner of the intersection of Fifth street and the avenue, and upon the sidewalk line, stood the two-story building known as the Building and Loan Association Building, occupied by plaintiff and her parents. At the northeast corner, and upon the lot line, had been constructed the Fifth Avenue Hotel, a two-story building, fronting 75 feet on Fifth street, and extending east on the avenue to the alley, between Fourth and Fifth. At the northeast corner was the office of the lumber company. The southwest corner was vacant. These streets, in the vicinity of their intersection, were traversed by vehicles, school children, working men and other pedestrians, and Eastland, the motorman in charge of the car, at the time of the accident, knew all those conditions and surroundings. East-bound cars stopped at the cross-walk, on the east side of Fifth street, to receive and discharge passengers, and west-bound cars stopped at the cross-walk, on the west side of Fifth street, for the same purpose.

It was at a point midway between these cross-walks, in the center of Fifth street, and between the rails of the north tracks, that the plaintiff collided with one of defendant's west-bound street cars, resulting in injury and amputation of her right limb below the knee. The rate of speed at the time of the accident is estimated by the witnesses to have been from three to thirty-five or forty miles per hour.

A few minutes before the accident plaintiff, who resided at the southeast corner of the intersection of Fifth

street and Metropolitan avenue, started on an errand necessitating the crossing of Metropolitan avenue and Fifth street at their intersection by her in order to reach her point of destination.  As the child and a small companion were crossing this intersection from the southeast to the northwest corner, in a diagonal and northwesterly direction, a street car approached from the east, down grade, without giving any note of warning to the children as they were running toward the track.   The avenue between Fourth and Fifth is 226 feet, with an alley way on the north side about midway between Fourth and Fifth streets.   Cross-walks 55 feet apart extend over the avenue both east and west of the intersections of these streets.   The Fifth Avenue Hotel, a two-story structure, stands on the building line of Fifth street and the avenue, extending east to the alley.   The avenue from Fourth to Fifth street was smooth, and the view unobstructed between the building lines, by any natural objects.   The west-bound car was at or east of the alley in the rear of the hotel, at the time the plaintiff and her companion started across the intersection of these streets.   She was seen by a number of witnesses from the car after it turned west on the avenue near Fourth street, as well as by a number of witnesses situated around this intersection.

Mrs. Elizabeth Egan, a witness for the plaintiff, who was a passenger on the car, and who had traveled over the line every other day for a year preceding the accident, testified that the car was going faster on that trip than at any other time that she had noticed it going along the line.   That the reason she noticed it was that when the car was going down the hill from Fourth to Fifth street, she had a little boy on the seat with her and when they turned they were going so fast that she held him to keep him from sliding off the seat, the car was going so fast he would have fallen right out of the seat, if something had not held him.

Charles Curth, who was on the sidewalk, on the

south side of the avenue, about midway between Fourth and Fifth streets, testified substantially as follows: That his attention was directed to the car going west; that it was going mighty fast around the corner, and he kind of watched how fast it went down and that his attention was attracted to it, because it came faster than a car goes any place in Argentine, that is to say, from thirty-five to forty miles per hour.

O. R. Croul, a former gripman for defendant, was crossing Fifth street near the avenue on the north side at the time of the accident and saw the west-bound car pass the east-bound car near the middle of the block. He testified that he observed the speed of these cars, and that the car going west was running fast. That he tried to catch the car going east and failed, and then tried to catch the car going west and failed in that also. That he was able to state about how fast the west-bound car was going, and would judge about fifteen or twenty miles an hour, as near as he could tell.

Frank Moffit, a railroad man of four years' experience, who was standing in an alley between Fourth and Fifth streets near the place of the accident, testified that he noticed two street cars about the time the girl was hurt, one was going east, the other west. That when the car was going east the girl was standing on the east side of Fifth street on Metropolitan avenue down between the walk and the car track, with some little boy; that the cars were going, one east, the other west, and he heard the motorman halloo, and heard the child scream and saw her rolled in front of the car, and the woman take her up in her arms. That he did not see the little girl and boy attempt to cross the track until after the east-bound car had passed, and as quick as the east-bound car had passed they ran right behind it and in front of the west-bound car. When they were in front of the west-bound car they were probably five or six feet from it, not more than that. As near as he could come to it its rate of speed was ten or twelve miles an hour. He did not hear

the bell on that car ring as it was coming down the hill between Fourth and Fifth streets.

Theodore Schweitzer was a passenger on the car. He testified that when the car came down the avenue, it was going as fast as they usually come down and kept about the same speed until it stopped, at which time the little girl was crossing the street. When the car stopped she was lying about the middle of the road.

A. P. Butcher, who saw the accident, testified that the car was coming down the hill fast, at the rate of nine or ten miles an hour; it was in the evening when the street-car fellows were making time. That the children were playing in the street, and in attempting to cross the track, "the car was coming from the east upon the avenue upon the crossing at rather a rapid rate of speed, as he thought, and also one approaching from the west, and the two cars passed each other right on Fifth street in the open there; and the little girl attempted to dodge the car, and with the other car approaching got caught by the one running down hill, as I saw it." A bell was rung on one of the trains but he could not say which one. The child was struck about Fifth street.

Lydia Fox, witness for plaintiff, stated that she was walking up the street, and the car was coming down, and the little girl was on the north side of the street right at the Fifth Avenue Hotel. She started across the street and the witnesses hallooed at her, and she started back, then started up, and, before she could get across between the two tracks, she was caught and knocked down in front of the car. When she first saw the car it was right south of the hotel coming down grade. The car stopped a little bit east and pretty close to the crossing. She saw the child going across and the car was going at such a speed she knew if she started she would be run over. When the child passed in front of the car she was nearer to four than six feet in front of it, and was about the center of the track when the car struck her.

J. W. Stubbs, a witness for the plaintiff, a former employee of the defendant, with twenty-one months' experience. as motorman for defendant in Armourdale, Kansas, testified that he had crossed the place where the accident occurred as motorman and from his experience as motorman he was able to state in about what distance those cars could be checked or stopped in passing down the grade between Fourth and Fifth streets carrying a load of two boys, fifteen or sixteen years old, two ladies, two children from two to six years old, the motorman and the conductor. And that you can stop in thirty feet. If going from fifteen to thirty miles an hour, it could be stopped at forty or fifty feet, and if a man is of a mind to he can stop it in less than that, I have stopped them in less than twenty feet.

There was also evidence that at the time of the accident defendant's motorman on the car was looking north at a young lady at a window in the second story of the Fifth Avenue Hotel, and not along the track in front of him.

T. R. Eastland, witness for defendant, who was motorman on the car which caused the injury, testified as follows:

"Q. Do you remember anything concerning the accident to the child? A. Why, yes, sir, I do.

"Q. You may tell the jury in your own way and manner when you first saw the child and all concerning the accident, what you did, if anything, to prevent striking, and all the circumstances in connection with it? A. Well, at this point where this happened it is down grade, and there was a car at this crossing.

"Q. A car standing on that crossing? A. A car standing at that crossing.

"Q. Which way was that car going? A. And it was going east and I was going west.

"Q. Yes? A. And the first thing that I saw of

the little child she ran in front of my car as close from me as to that gentleman there.

"Q. You may state where the child came from when you first saw it? A. Well, the child came from behind this car that was standing on the east-bound track.

"Q. Then in which direction was the child going? A. It was going north.

"Q. It was going north? You said that it ran into your car or against your car? A. Ran in front of my car.

"Q. In front of your car, yes, sir; tell these gentlemen what you did when you saw the child, if anything, to stop your train? A. Well, I was going down grade; I had my car slowed down to a very slow speed, had one hand on the brake at the time, just holding it at about a certain rate of speed down the grade, and the minute I seen the child in front of me, or the minute it ran in front of me, I took both hands and set my brake just as tight as I could and as quick as I could.

"Q. Were there any other children besides this child that was injured that you saw there? A. Why I saw a boy, I think it was a colored boy, run across the track.

"Q. You may state whether you gave any signals of the approach of your car on reaching Fifth and Metropolitan? A. I was ringing my bell as I came down the hill meeting this car, and it is customary for us always to ring our bells when we meet a car and it standing still.

"Q. You may state to these gentlemen how long prior to reaching the crossing and prior to striking the child had you been sounding your gong? A. Well, for nearly half a block.

"Q. Where did your car stop that day? A. Right on the crossing.

"Q. Is that the ordinary and usual place where

you stop? A. That is about where we usually stop, yes, sir, it is about that.

"Q. Where was the child when you struck the child, what part of the street? A. Near the middle.

"Q. Where was the east-bound car that you speak of? A. It was—well, I wouldn't say that it was exactly on the crossing, because it is something that we seldom ever do; we stop at the crossing on account of the grade; sometimes pull up to it, and sometimes stop a little west on account of the grade; your car will stand there without you having to hold your brakes all the time, but it was near that crossing.

"Q. Now, you may state what observation, if any, you were making of the street in front of you when you came down on Metropolitan from Fourth to Fifth? A. I wasn't making any; I was noticing the car stopped in front of me, and I noticed for to see if there was anyone getting off of the car, but I didn't notice any one getting off.

"Q. Yes? A. Saw no one step from behind it until I got to it.

"Q. So that as the child ran around that car you then, if I understand you, put both hands on the brake? A. Yes, sir.

"Q. I will ask you to state whether or not you could have stopped that train or that car any quicker than you did stop it that day? A. No, sir.

"Q. Now, I get it? A. And then it pulls up here and stops; it had stopped before I got to it, and as I got to this car, as I came on to it, the front end of my car came even this way, it was standing there.

"Q. You noticed children playing on the sidewalk? A. How many I could not say.

"Q. You were not interested in people passing on that street there or standing on the crossing either? A. I was interested in watching my track in front of me, you understand.

"Q. Where were you then; where was this east-

bound car when you ran over the child? A. Well, to the best of my knowledge that car started just as I—just as the child ran out in front of my car, this other car started.

"Q. And you were only running about three miles an hour? A. That is what I think I was.

"Q. In what distance can you stop such a car as that with the appliance while running at the rate of three miles an hour? A. From forty-five to sixty-five feet.

"Q. How far would it take you to stop on a level? A. Well, about from thirty to fifty feet.

"Q. And your car ran how far after you struck the child? A About thirty feet, I think.

"Q. Do you know how wide that street is there? A. Yes, sir.

"Q. How wide is it? A. Forty feet.

"Q. Was she running? A. Yes, sir; and when I was ringing the bell, and when I saw her run so close to me, right up so close, as near as from me to you there, I hollered at her, as well as ringing my bell, and some other gentleman standing on the corner, I presume he was, some other gentleman, he told me afterwards he was the man—anyway, some gentleman, somebody, hollered at her to go back, and the minute she got on the rail just as I seen her on the track, she whirled around.

"Q. Yes? A. Just as I first saw the child she was in the act of turning around.

"Q. Yes, but she fell between the two tracks, and not between the two rails of the track that you were on? A. She fell between the two tracks, near my track, but between the two tracks.

"Q. And didn't fall on your track at all? A. So near it that it caught her foot, but her body did not fall on the track.

"Q. Stumbled and fell on the track? Now you had not seen her until you saw her in the middle of the track

ahead of you? A. She dashed right on the track; when I first seen her she was on the track.

"Q. That is right, the first thing you saw of her she came right on the track immediately ahead of you? A. Yes, sir.

"Q. What were you doing all this time she was coming around behind the car, and passing over between that track and up to the other, and down into the center of that street, where were you when she was doing that? A. They only have there about eighteen inches from behind one car to another for to pass by.

"Q. Do you get the idea, assuming that she was coming from behind this car here, with your cars in the proximity that I have described, which you say is probably a foot or two, enough for a man possibly to get through that, now how far would the girl have to run? A. From here?

"Q. Yes? A. From this car?

"Q. Yes, sir. A. That is a hard question for me to answer in feet.

"Q. What is your judgment about that, three or four feet or five feet? A. Yes, sir; she would have to go that much for to run from the car.

"Q. Now, as you were coming in this way with your car, could you see anybody behind this east-bound car? A. No, sir.

"Q. Your view? A. Your view here is obstructed by this car, yes, sir.

"Q. So that it would be impossible for you to see anybody behind that car until you got opposite it? A. Yes, sir."

H. C. Kruger, conductor on the train, testified that it was going at about three miles per hour or a little over that day. That there were bells ringing, "I think they were ours as near as I can remember." We met a car going east. "There was a car standing up just from the corner, made a stop and picked up a passenger there,

just as we passed there they started up.   The child was about the middle of the street."

J. B. Crane, conductor on the car going east, testified that his train was going east about five o'clock on the afternoon of the accident.   That they stopped at Fifth and Metropolitan for a passenger, and while they stopped there the other car came up going west; they were going east, and stopped about five feet west of the east crossing; a passenger got on there. The west-bound train passed his train, just about the time his train was in the act of starting.   That car going west was running at the rate of three or four miles an hour.

Edward Sedgwick, motorman on the east-bound train, testified that the west-bound train passed them at the east crossing.   It was running between four and five miles an hour.   The bell was ringing, that is, the gong.

Mary Drolinger, witness for defendant, stated that a car bell rang, but whether it was the east or west-bound car bell she could not say.   The speed of the west car was just about the same as of cars generally when they are going to stop there any way, when the cars passed each other; the east-bound car was just starting when the west-bound car came by. They passed each other on the east side of Fifth street.   She saw the little child before it was hurt; she was waiting for the east-bound car to go up.   When she next saw her, she came right behind the car, then the west-bound car passed directly on the crossing, and obstructed her vision so that she could not see any more.   She last saw the child before it was hurt just as she came behind the east-bound car, just as the west-bound car was going past. The child started to run.

Mrs. Stutty, who was a passenger on the west-bound car, testified that the bell rang on that car on approaching at or near Fifth and the avenue.   That the car was running slow compared to the way it usually moved along.

James M. Howard testified that the first thing that

called his attention was that he heard some one hollow, and looked out the door, and the car had just passed off the child. It was lying in the middle of the street as near as could be. He saw a car going east at that time, just as the west end of which must have been across the east crossing of Fifth street when he noticed it.

John Obliges, a passenger on the car, stated that the first thing he saw was a lady standing on the crossing and she threw up her hands and commenced to scream. The car stopped right on the west crossing.

Blatherwick testified that about the time the east-bound car came up the little girl was standing on the corner there getting out of its way. This car stopped, and about this time the west-bound car came along, and when the east-bound car started up the hill, she ran from behind it and right in front of the west-bound car which struck her about the middle of the street. When the children stepped out from the back of the car going east, the one going west was about six feet from them. He saw the children all the time from the time they started behind the east-bound car until the car struck the little girl, and shut out his view. He hallooed at them, when he saw the children start across.

G. F. Overman testified that he saw the children on the street, and saw both trains coming. When the car coming east got to Fifth and the avenue it stopped. When the children saw the car coming from the east they went right in behind the east-bound car. The west-bound car was then about the front of the east-bound train and the children ran around from the west side of the east-bound train in front of the west-bound train. Heard bell ringing. Train was not going more than six or seven miles an hour. Would say the child was struck on about the center of the street.

One expert witness on the part of defendant testified that under the conditions stated the motorman could stop a car running down that track at the rate of four miles an hour, in sixty feet.

Elbert E. Hunt, another expert witness, testified that a car running down that track at the rate of three or four miles an hour, a stop in forty-five or fifty feet would be a good stop.

Over the objection and exception of defendant the court at the instance of plaintiff instructed the jury as follows:

"1. The court instructs the jury that if they find from the evidence that on the 23rd day of March, 1901, Martin Heinzle was duly and regularly appointed next friend of the plaintiff, Anthanette E. Heinzle; that the defendant corporation was operating an electric street railway, running for a part of its course east and west along Metropolitan avenue, in the city of Argentine, Wyandotte county, Kansas, at its intersection with Fifth street, another public highway of said Argentine; and that if you further find that on the 26th day of February, 1901, the plaintiff, Anthanette E. Heinzle, five years of age, was on foot crossing said Metropolitan avenue and the tracks of the defendant at the regular street crossing of said Metropolitan avenue and Fifth street, and approaching a car of the defendant moving westward on said tracks, and that she was at the time of and just preceding the injury, in the exercise of such care and caution as a person of her age, discretion and experience would naturally and ordinarily use under similar circumstances, and if you find that servants and agents of defendant, in charge of and operating said car on its road at such time and place, failed to sound a gong or warning signal, and if you find that the failure, if any, to sound such gong was negligence, and if you further find that the servants and agents in charge of said train failed to keep a proper lookout for said infant, while she was approaching its car on said tracks, if you find that she was so approaching, and that such failure, if any, to keep a proper lookout was negligence, and if you further find from the evidence that in consequence of such fail-

ure, if any, to sound a warning signal, if any, to keep a proper lookout for said infant while she was approaching the track along which the train was moving, or to keep said car under control and moving at a reasonable rate of speed, the plaintiff was struck by said car, and by it run over, sustaining such injuries to her person as alleged, then you will find a verdict for the plaintiff.

"2.   You are instructed that it is the duty of one having the control of the movements of electric cars in towns and cities, to keep a constant lookout along the track where persons are likely to be; and if you find from the evidence that the defendant's servants in charge of said car, by having their attention on the street in front of said car, might have discovered, in time to have stopped the car, that a child was about to cross the track, or after discovering her danger they failed to give the usual signals to warn the child of the car's approach, they were guilty of negligence.

"3.   The court instructs the jury that it was the duty of defendant's motorman to sound his gong or bell when approaching Fifth street, so as to give notice to persons desiring to cross said street of the approach of said car, and if you find from the evidence that said motorman failed to sound his gong or bell or give any other warning when approaching said street, and that but for his failure to sound his gong or bell or give such warning, the accident complained of would not have happened, your verdict should be for the plaintiff, provided you further find from the evidence that plaintiff at the time exercised such care for her own safety as could be reasonably expected of a child of her age and capacity.

"4.   The jury are instructed that, even if they should find from the evidence that the plaintiff was negligent in going upon the track of the defendant company, yet the court further instructs you that such negligence will not of itself prevent a recovery in the case by plaintiff, provided you further find from the evidence

that the motorman and conductor, in charge of said car, by keeping a vigilant watch for persons moving towards the track could have seen the plaintiff approaching the track in time to have prevented the car from running over and upon her. If you find from the evidence that said motorman and conductor, or either of them, was not keeping such a vigilant watch, and you further find from the evidence that the plaintiff would have been seen by said motorman and conductor, in a position of danger, in time to have avoided running over her, then your verdict should be for the plaintiff, although you should also find that the plaintiff was guilty of negligence in going upon the track.

"5. The court instructs you that while the defendant company was permitted by ordinance to run its cars at the point where the accident happened, at a speed not exceeding fifteen miles per hour, yet such permission fixed the highest rate of speed at which the defendant company was permitted under any circumstances to run, and did not authorize the defendant company to run at such rate regardless of any and all circumstances and conditions that might exist. If, therefore, you find from the evidence that the plaintiff, Anthanette E. Heinzle, was run over and injured as alleged, by defendant's car, at a point on the defendant's tracks where the defendant's servants and agents had reasons to anticipate the appearance of children and other persons upon the track, and if you further find that the defendant at the time of the injury was running its said car at a rate of speed which under the facts and circumstances, shown by the evidence, was careless, negligent and dangerous, and in consequence thereof ran over and injured said plaintiff, and provided you further find from the evidence that said Anthanette E. Heinzle, at the time, exercised such care for her own safety as could be reasonably expected of a child of her age and capacity, then your verdict should be for plaintiff, although you should also find

that such rate of speed did not exceed the rate of fifteen miles per hour.

"6.    If you find for the plaintiff you will, in assessig her damages, take into consideration her age and condition in life, the injury sustained by her, the physical pain, mental anguish, the loss of health, and the impairment of her capacity and ability to earn a livelihood, if any, suffered by her because of said injury, and such damages, if any, of the nature above specified as you believe from the evidence she will sustain in the future, and the direct effect of said injury, and assess the same in such amount as, under all the facts and circumstances shown in evidence, will be a just and reasonable compensation to the plaintiff, not exceeding the sum of twenty-five thousand dollars.''

At the request of the defendant the court instructed the jury as follows:

"1.    The court instructs the jury that in considering this case they should not indulge in any mere suppositions or imaginings as to what may or may not have been done or occurred at the time of the occurrence, but must decide the case upon the evidence of the witnesses and the instructions of the court.

"And the court further instructs the jury that they are the sole judges of the credibility of the witnesses and the weight to be given to their testimony, and in weighing the testimony the jury should take into consideration not only what they have testified to, but also their manner of testifying, and their bias, if any is shown, towards or against plaintiff or defendant, their liability at the time to clearly see what occurred, and now to clearly recall and relate the facts, and if the jury believe from the evidence that any witness has knowingly sworn falsely to any material fact, then the jury may disbelieve the whole or any part of such witness's testimony.

"2.    This case should be considered by the jury the same as if it were a contest between two persons of equal standing in the community.    The fact that one of

the parties is an infant and the other a corporation, should not affect your minds in any way, but the rights of the parties should and must be determined upon the evidence introduced in the case, the instructions given to the jury, which is the law and only law to guide you in your deliberations.

"These instructions, although read to you by the lawyers, are the court's instructions and must be taken and considered by the jury the same as if they had been read by the judge from the bench.

"3. If you believe from the evidence that the injury was merely the result of an accident, your finding will be for the defendant.

"4. The court instructs the jury that it was the duty of the plaintiff before going on or across the tracks of the company to look and listen for approaching cars; and if she failed so to do, and by looking and listening she could have seen or heard the approaching car in time to have averted the injury to herself, then you must find your verdict for the defendant, unless you further find from the evidence that the plaintiff was in the act of crossing the track and the employees of the defendant engaged in the operation of its car, after they saw, or by the exercise of ordinary care could have seen, that plaintiff was in the act of crossing the track, failed to use such care and caution in stopping said car to avoid injury to said plaintiff, as a person of ordinary care and prudence would have exercised under like and similar circumstances.

"5. It is the duty of a person before attempting to cross a railroad track to look and listen for approaching cars, and to exercise ordinary care to avoid coming in collision with the car; and if you find from the evidence in this case that the plaintiff did not look and listen, and that by doing so she would have observed the approaching car and by the exercise of ordinary care would have avoided the collision, then your verdict must be for the defendant.

"6. It is the duty of a person who is about to step upon a railroad track to look and listen for approaching cars in both directions, and if you believe from the evidence that at the time plaintiff stepped upon the track she could by looking have seen, or by listening have heard the approach of the car by which she was struck and avoided a contact therewith, but did not so look and listen, then your verdict will be for the defendant.

"7. The court instructs the jury that there is no liability whatever on the part of the railroad company, and there is no presumption of negligence on the part of the motorman, and the jury must not presume any, from the mere fact that the car struck the plaintiff and it was run over by it and injured.

"8. The court instructs the jury that it is the duty of persons before crossing the street upon which electric cars run, to listen and look for cars that may be approaching, and if they can be heard or seen, and there is any danger from them in attempting to cross the track, then they must stop before reaching the track and let the car pass, and not put themselves in danger from it, and if the jury believe from the evidence that plaintiff had capacity to know that if she got upon the track in front of or near to the approaching car she might be struck and hurt, and the jury further believe that she could, by the exercise of ordinary care as explained in these instructions, before leaving the pavement or reaching the track, have seen or heard the approaching cars, then it was her duty to stop, and not run upon the track, and your verdict must be for defendant.

"9. Although you may believe that the motorman saw, or by the exercise of ordinary care might have seen the plaintiff standing on the south side of the street to permit the train going east to pass, and although you may believe that the motorman knew, or ought to have known that she intended to cross the tracks, he had a right to presume that she would not start to cross in front of a moving car, and he was not required to stop,

or attempt to stop, his train until such time as he saw, or could have seen, her in a position of peril—that is, after she had started, after so stopping, and was on or so near the track on which the said motorman's train was running that if he did not stop she would be injured, and if it was then too late to stop his train and avoid injury, plaintiff can not recover.

"10.   The court instructs the jury that the employees of the defendant company owed to the plaintiff only that degree of care which an ordinarily careful and prudent person engaged in the same business would have exercised under like and similar circumstances; and if the jury believes from the evidence that the employees of the defendant company exercised such care, then the jury will find their verdict in favor of defendant."

Defendant also asked the court to give the following instructions:

"1.   Under the pleadings and the evidence your finding must be for the defendant.

"2.   The court instructs the jury that if you find that the plaintiff was in a place of safety before she stepped on the track, when the motorman first discovered her, then the motorman had a right to presume that she would not go on to the track in front of an approaching car, and the motorman was not required to make any effort to stop his car until he discovered that plaintiff had started or was starting to go on the track.

"3.   There is no evidence that the motorman saw, or could have seen, the plaintiff in a position of peril, in time to have stopped the car, and on that issue your finding will be for the defendant.

"4.   There is no evidence that plaintiff was injured by reason of the rate of speed at which the car ran, and on that issue your finding will be for the defendant.

"5.   There is no evidence that the plaintiff was injured by reason of failure, if there was a failure, to ring the bell, and on that issue you will find for defendant."

Which instructions the court refused to give; and defendant by its counsel then and there duly excepted.

The court of its own motion over the objection and exceptions of defendant gave the following instructions:

"1.   The court instructs the jury that it is not necessary that all of the jurors should concur or agree upon the verdict to be rendered herein, but if nine or more, but less than twelve members of the jury, agree upon a verdict, then the jurors so agreeing sign the verdict so agreed upon and return the same as their verdict in this case.   If all the jurors agree upon the verdict then only your foreman is required to sign the verdict.

"2.   The court instructs the jury that if you find for the plaintiff, your verdict will be in the following form:

"We, the jury, find for the plaintiff and assess her damages at the sum of $............Dollars.

"If you find for the defendant your verdict will be as follows:

"We, the jury, find the issues for the defendant.

"3.   The difference between negligence on the part of the cable company, if any, and on the part of the plaintiff, if any, is this:   Negligence on the part of the company, if any, before the plaintiff can recover, must by the jury be found to be the cause of the injury; whereas, negligence, if any, on the part of the plaintiff defeats a recovery if it directly contributed to the injury.   And this is true, even though the company was guilty of negligence which concurred with the negligence of the deceased, if any, in producing the injury.

"The plaintiff was required to exercise ordinary and reasonable care for her own safety.   If she did not do so, she was negligent, and plaintiff can not recover.

"4.   If you believe that both parties were negligent and the negligence of both directly contributed to the injury then there can be no recovery herein.

"5.   The court instructs the jury that while the plaintiff was not required to use greater care and cau-

tion than children of her age and experience would ordinarily use under the same circumstances, nevertheless, she was required to use such care and caution, and if you further believe from the evidence, that in going or running towards the track, she was negligent, and thereby caused her being struck by the car, then your verdict must be for the defendants.

"7.    The court instructs the jury that a street railway company is not obliged to stop its cars or slow up, because there are persons, adults or children, on the pavement; that the defendant had the right to run its train at Fifth street and approaching it, at fifteen miles an hour, and the motorman was not required to slow up or stop merely because there were persons on the pavement or near the track, and you must not presume any negligence on his part merely from that fact, and if you believe from the evidence that as he was approaching Fifth street and crossing it, he was looking ahead of him down the street, attending to his duties as defined in the instructions, and that while plaintiff was running from the pavement towards him he saw her as quickly as he could by the exercise of ordinary care on his part, under all the circumstances in evidence, and promptly did his best to stop the train, then the jury will find their verdict in favor of the defendant; and the court further instructs you that if you believe he did not do so, but was negligent, and you also believe from the evidence that plaintiff was also negligent for one of her age and capacity, as explained in these instructions, in running directly in front of the train and so near to it as she did, and that she thereby directly contributed to the accident, then your verdict must be for defendant.

"8.    Even though you should find that the cable company was guilty of negligence as submitted by these instructions, yet the plaintiff can not recover unless you further find from the evidence that such negligence was the direct cause of the injury.    If it was not the direct cause of such injury then the plaintiff can not recover.

"Or if the plaintiff was negligent and thereby directly contributed to her injury, then and in that event you must find against plaintiff, even though you may find negligence as charged therein against the cable company which concurred in producing the injury."

It is said for defendant that it was essential to plaintiff's recovery that she would show within what distance a car could be stopped and for that purpose introduced but one witness, J. W. Stubbs, in the admission of whose testimony over timely objection by defendant upon the ground that he had not shown himself to be qualified as an expert, and the want of sufficient evidence upon which to predicate a hypothetical question, error was committed. This witness testified that he had been in the service of the defendant for fifteen or sixteen months as motorman, knew where Fifth street in Argentine crosses Metropolitan avenue, and had gone over defendant's line at that point twenty times a day; that is, going west about ten, and coming east about ten, for about fifteen or sixteen months; that he was familiar with the road at the intersection of Fifth street and Metropolitan avenue. "That it was down hill until we just about struck the street; it was quite a grade going down, and then after we struck the street it was level." Witness was then asked the following question: "Now, from your experience as a motorman on this line and at this particular place, are you able to state in about what distance one of those cars could be checked or stopped in passing down the grade between Fourth and Fifth street carrying a load of two boys, fifteen or sixteen years old, two ladies, two children from two to six years old, the motorman and conductor, moving at the rate of from six to twelve miles an hour, eight to twelve miles an hour?" He answered: "Yes. In thirty feet. And if running at the rate of fifteen or thirty miles an hour, under the same conditions and at the same place, it could be stopped at forty or fifty feet." It seems to us

that the witness was clearly qualified from experience and personal knowledge of the situation to testify as an expert, but the proper predicate was not laid upon which he should have been permitted to express an opinion in that it was too restrictive and did not embody important facts in the case. It should have embraced the time and space within which a car like this one could have been stopped by a reasonably skillful motorman, after he discovered or might have by reasonable care discovered the little girl in danger, with due regard to the safety of the passengers. [Ruschenberg v. Railroad, 161 Mo. 81; Culbertson v. Railroad, 140 Mo. 59; Mammerberg v. Railroad, 62 Mo. App. 563.]

In regard to the testimony of plaintiff's witnesses with respect to the speed of the train at the time of the accident we are unable to discover any ruling of the court which would justify a reversal of the judgment upon that ground.

It is contended by defendant that the demurrer to the evidence of the plaintiff should have been sustained, and its peremptory instruction at the conclusion of the whole case given. It is insisted in the first place that there was no evidence that the failure to ring the bell, if there was such failure, was the proximate cause of the injury. It is true that there was not upon this point any evidence tending to show that the failure to ring the bell by defendant was the proximate cause of the injury, nor was there any evidence from which it could be inferred that the proximate cause of the injury was the failure to do so. But we are unable to concur in the contention that there was not sufficient evidence that the train was being run at a rapid and unusual rate of speed to take the case to the jury upon this theory of the case. It is conceded by defendant that the evidence conflicted as to the rate of speed of the train and whether such rate constituted a proper rate of speed or not depended upon the character of the train, the location and par-

ticular surrounding of the track and other circumstances.

Nor was there error in the refusal by the court of the fourth and fifth instructions asked by defendant, for the reason that they applied the same rule, in determining what would be contributory negligence on the part of plaintiff, as to one who had arrived at any age, to possess ordinary judgment and discretion, when all that was required of her in order to give her a right of action against the defendant for an injury inflicted upon her by it, is, that she should have exercised care and prudence equal to her capacity. [Boland and wife v. Railroad, 36 Mo. 484.]

In O'Flaherty v. Railroad, 45 Mo. l. c. 73, it is said: "In discussing the question of infantile responsibility in a case in this court, we held that the same rigid rule, in determining what would be a bar to an action on the ground of contributory negligence, would not be applied to an infant, an idiot, or an insane person, as to one who had arrived at an age to possess ordinary judgment and discretion. All that was necessary to give a right of action for an injury inflicted by the defendant was that the injured person should have exercised care and prudence equal to his capacity (Boland and wife v. Railroad, 36 Mo. 484). The young and the old, the lame and infirm, are entitled to the use of the streets, and more care must be exercised towards them by persons controlling or managing cars and vehicles than towards those who have better powers of motion. A child or young person can not be expected to possess that vigilant foresight which would be exacted of a person of maturer years. But it does not thence follow that they are to be denied the privilege of going on the streets, and, if they do so go, they may be killed with impunity."

The same rule is announced in Frick v. Railroad, 75 Mo. 595; Dowling v. Allen & Co., 88 Mo. 293.

In the case of McCarthy v. Railroad, 92 Mo. 536, this rule was applied to a boy between eight and nine

years of age, and in Anderson v. Railroad, 161 Mo. 411, to a boy eleven years of age.

As was said in the case of Winters v. Railroad, 99 Mo. l. c. 517: "If the defendant's liability in this case is limited to want of care on the part of its servants after they saw the boy in a dangerous situation, then the plaintiff failed to make out a prima facie case. The evidence is all to the effect that the gripman used all the means at his command to avoid the calamity, after he knew the boy was in danger. But the principle of law just stated does not control this case. The defendant is operating dangerous machinery at a rapid speed on and along the public streets of the city, and must know, and in law is bound to know, that men, women and children have an equal right to the use of the highway, and will be upon it. It is the duty of the defendant's servants to be on the lookout, and to take all reasonable measures to avoid injuries to persons who may be upon the street. The duty to be on the watch is no more than ordinary care under such circumstances. The care to be used to be ordinary care must depend upon the surrounding circumstances."

In Frick v. Railroad, supra, it is said: "It has been repeatedly held by this court that greater care is to be exercised by the persons managing a train of cars, within the limits of a town or city, than is required in the country. [Brown v. Railroad, 50 Mo. 461; Maher v. Railroad, 64 Mo. 276; Hicks v. Railroad, 64 Mo. 439; Harlan v. Railroad, 65 Mo. 24.] In Brown v. Railroad, supra, it was said that in towns caution should always be used, and the degree of care to be exercised must of course be proportioned to the danger to be apprehended of inflicting injury on others. At street crossings, in a town or city, where the public have a right to be, and where people are constantly passing and repassing, a high degree of vigilance should be exercised. The signals required by law for the protection of travelers upon the highway, should be given, and the servants of the

company in charge of the train should be at their posts, observant of the track, and ready at a moment's notice, to avert, if possible, any apprehended danger.''

There was evidence tending to show that about the time the train arrived, plaintiff and other children were playing near the track, and as it approached plaintiff and the little boy started to cross the track, and at the same time the motorman was not looking in front of his train, but was looking at a lady in a window in the second story of a nearby hotel, which was upon the opposite side of the track from which the plaintiff approached the track. The petition alleges that the defendant's agents, servants and employees in charge of said car, negligently and wrongfully failed to keep a lookout ahead for pedestrians or other obstructions on or near defendant's tracks at said street crossing, as required by law. That they saw the dangerous and perilous condition of plaintiff on and near its said tracks in time to have checked or stopped said car before striking plaintiff, or by the exercise of ordinary care could have seen the perilous position in which she was situated in time to have done so. It was the duty of defendant's motorman on the car to be on the lookout, and to take all reasonable measures to avoid injuries to persons who might be upon the street, and if he might by having his attention on the street in front of the cars have discovered in time to have stopped the cars that the child was about to cross the track and failed to discharge his duties in these respects he was guilty of negligence. [Baird v. Railroad, 146 Mo. 265; Meeker v. Railroad, 178 Mo. 173.] So that upon either theory of the case, that is, whether under all the facts and circumstances in evidence the rate of speed of the train was improper or dangerous and the injury occasioned by reason thereof, or defendant's motorman by the exercise of ordinary care could have seen the perilous position in which plaintiff was situated in time to have avoided her injury,

the questions of negligence were for the consideration of the jury.

Plaintiff's first instruction is erroneous in that there was no evidence that the failure to ring the bell or sound the gong, if such was the case, contributed to the injury. It submitted to the jury for determination the question as to whether or not Martin Heinzle was duly and regularly appointed next friend of the plaintiff, when that matter was a question of law to be passed upon by the court.

It is also faulty in that it enlarges upon the allegations in the petition in saying "or to keep said car under control" when there is no such averment in the petition.

Plaintiff's second instruction is vicious in that it told the jury that if the employees failed to give the usual signals after discovering the danger the child was in, to warn her of the car's approach, they were guilty of negligence, when there was no evidence to warrant it.

Plaintiff's instruction numbered three should have been refused for the reason that the evidence does not show or tend to show that the failure of defendant's servants in charge of the train to sound the gong or ring the bell when approaching Fifth street, if such was the case, had any connection whatever with the accident.

Upon another trial plaintiff's instruction numbered four should be restricted to the "motorman" who had control of the movement of the train.

We are unable to see any substantial objection to the fifth instruction given for plaintiff. It was authorized, we think, under the allegation in the petition that defendant's servants and agents in charge of said car, negligently and wrongfully approached said crossing at a rapid and unusual rate of speed, in consequence of which plaintiff was run over and injured.

We may be permitted to suggest that upon another

trial the words "the loss of health" be omitted from plaintiff's sixth instruction.

Our conclusion is the judgment should be reversed and the cause remanded to be tried in accordance with the views herein expressed.

It is so ordered.

All concur.